ORAL ARGUMENT NOT YET SCHEDULED
No. 20-5197

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK, Chairman of the Yankton Sioux Tribe Business and Claims Committee; OGLALA SIOUX TRIBE,

*Plaintiffs-Appellees,*

CHEYENNE RIVER SIOUX TRIBE; STEVEN VANCE,

*Intervenors for Plaintiff-Appellees*,

v.

UNITED STATES ARMY CORPS OF ENGINEERS,

*Defendant-Appellee*,

DAKOTA ACCESS, LLC,

*Intervenor for Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:16-cv-1534

## REDACTED OPENING BRIEF FOR DAKOTA ACCESS, LLC

Miguel A. Estrada
  *Counsel of Record*
William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mestrada@gibsondunn.com

*Counsel for Dakota Access, LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), intervenor-defendant-appellant Dakota Access, LLC (or "Dakota Access") certifies as follows:

### A.     Parties

The plaintiffs-appellees in this case are the Standing Rock Sioux Tribe; Yankton Sioux Tribe and Robert Flying Hawk, Chairman of the Yankton Sioux Tribe Business and Claims Committee; and Oglala Sioux Tribe. The intervenors-plaintiffs-appellees in this case are Cheyenne River Sioux Tribe and Steve Vance. Defendant-appellee in this case is the United States Army Corps of Engineers. Intervenor-defendant-appellant in this case is Dakota Access.

### B.     Rulings Under Review

The rulings under review are the June 14, 2017 Memorandum Opinion and Order (D.E. 238 & 239) granting summary judgment to plaintiff-appellee Standing Rock Sioux Tribe and intervenor-plaintiff-appellee Cheyenne River Sioux Tribe, and remanding the action to the Corps to reconsider its Environmental Assessment; the March 25, 2020 Memorandum Opinion and Order (D.E. 495 & 496) granting summary judgment to plaintiffs-appellees Standing Rock Sioux Tribe, Yankton Sioux Tribe and Robert Flying Hawk, and Oglala Sioux Tribe and intervenors-plaintiffs-appellees Cheyanne River Sioux Tribe and Steve Vance, and requiring the Corps to prepare an Environmental Impact Statement; the July 6, 2020

Memorandum Opinion and Order (D.E. 545 & 546) vacating the Corps' decision to grant Dakota Access an easement under the Mineral Leasing Act, and requiring Dakota Access to shut down and empty the Dakota Access Pipeline within thirty days.  The first two opinions are published in the Federal Supplement at *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101 (D.D.C. 2017) and *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 440 F. Supp. 3d 1 (D.D.C. 2020), respectively.  The third opinion has not yet been published in the Federal Supplement, but is available on Westlaw at *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, -- F. Supp. 3d -- , 2020 WL 3634426 (D.D.C. July 6, 2020).  Copies of the orders and memorandum opinions are set forth at **A1-163**.

## C.    Related Cases

This case was previously before this Court in *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, No. 16-5259, and in *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, No. 17-5043.  This case is also related to and consolidated with a case currently pending before this Court in *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, No. 20-5201.  Dakota Access is aware of no other related cases before this Court or any other court.

## CORPORATE DISCLOSURE STATEMENT

Dakota Access is a nongovernmental entity formed to construct and own the Dakota Access Pipeline.  Dakota Access is owned 75% by Dakota Access Holdings, LLC and 25% by Phillips 66 DAPL Holdings LLC.

These companies are in turn owned as follows:

1.    Dakota Access Holdings, LLC is wholly owned by Bakken Pipeline Investments LLC, which is owned 51% by Bakken Holdings Company, LLC, and 49% by MarEn Bakken Company LLC (a joint venture between MPLX LP and Enbridge Inc.).

2.    Bakken Holdings Company LLC is owned 60% by La Grange Acquisition, L.P. and 40% by Permian Express Partners LLC, which in turn is owned 87.7% by Sunoco Pipeline L.P. and 12.3% by Mid-Point Pipeline LLC (an indirect subsidiary of Exxon Mobil Corporation).

3.    Sunoco Pipeline L.P. is a wholly owned, indirect subsidiary of Energy Transfer Operating, L.P. ("ETO").

4.    La Grange Acquisition, L.P. is a wholly owned, indirect subsidiary of ETO.

5.    Phillips 66 DAPL Holdings LLC is owned 100% by Phillips 66 Partners Holdings LLC, which, in turn, is 100% owned by Phillips 66 Partners LP.

The following are parent companies, subsidiaries, or affiliates of Dakota Access, LLC, which have any outstanding securities in the hands of the public:

1.  Phillips 66 Partner LP.  Phillips 66 Partner LP holds an ownership interest in Dakota Access, LLC through several privately held subsidiaries.

2.  ETO.  ETO holds an ownership interest in Dakota Access, LLC through several privately held subsidiaries.  ETO has publicly traded preferred equity (NYSE: ETPprC, ETPprD and ETPprE), but no publicly traded common equity.  ETO also owns the general partner interest and certain limited partner interests in Sunoco LP (NYSE: SUN) and USA Compression Partners, LP (NYSE: USAC).

3.  Energy Transfer LP ("ET").  ET holds an ownership interest in Dakota Access, LLC through several privately held subsidiaries.  ET is a publicly traded partnership and is listed on the NYSE under the ticker symbol "ET."  ET owns 100% of the limited partner interests of ETO.

4.  MPLX LP, Enbridge Inc., and Exxon Mobil Corporation have several publicly traded entities.

August 26, 2020                          Respectfully submitted,

  /s/ Miguel A. Estrada
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mestrada@gibsondunn.com

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF AUTHORITIES ................................................... vii

GLOSSARY ................................................................. xii

INTRODUCTION ............................................................. 1

STATEMENT OF JURISDICTION............................................... 5

STATEMENT OF THE ISSUES................................................. 6

STATUTES AND REGULATIONS............................................... 6

STATEMENT OF THE CASE.................................................. 6

SUMMARY OF ARGUMENT .................................................. 14

STANDARD OF REVIEW .................................................... 16

ARGUMENT ................................................................ 17

    I.    The Corps Complied With NEPA........................................ 17

        A.    The Corps Reasonably Concluded That The Lake Oahe
              Crossing Would Not Significantly Impact The
              Environment.............................................. 17

        B.    The Corps Adequately Addressed The Controversies The
              District Court Identified............................... 20

        C.    *Semonite* Does Not Mandate An EIS........................ 24

    II.    The District Court's Remedies Are Unwarranted................ 28

        A.    An EIS Is Unnecessary .................................. 29

        B.    Vacating The Easement Was Unwarranted And Will Be
              Highly Disruptive....................................... 32

**TABLE OF CONTENTS** *(continued)*

Page(s)

    C.     The District Court's Injunction Is Ultra Vires ......................... 42

CONCLUSION ............................................................................................. 44

Page(s)

## TABLE OF AUTHORITIES

**CASES**

*Allied-Signal, Inc. v. NRC*,
  988 F.2d 146 (D.C. Cir. 1993)...................................................2, 4, 15, 32, 34, 35

*Am. Bankers Ass'n v. NCUA*,
  934 F.3d 649 (D.C. Cir. 2019)...................................................................32

*Apache Corp. v. FERC*,
  627 F.3d 1220 (D.C. Cir. 2010)...............................................................35

*Banner Health v. Price*,
  867 F.3d 1323 (D.C. Cir. 2017)...............................................................29

*Biodiversity Conservation All. v. U.S. Forest Serv.*,
  765 F.3d 1264 (10th Cir. 2014) ...............................................................26

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015) ...............................................................37

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006)...............................................................43

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991).................................................................34

*City of Oberlin v. FERC*,
  937 F.3d 599 (D.C. Cir. 2019).................................................................35

*Cronin v. DOA*,
  919 F.2d 439 (7th Cir. 1990) .................................................................29

*Ctr. for Biological Diversity v. NHTSA*,
  538 F.3d 1172 (9th Cir. 2008) .................................................................29

*Ctr. for Marine Conservation v. Brown*,
  1993 WL 108944 (D.D.C. Mar. 29, 1993) ..............................................30

*Cty. of L.A. v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999)..........................................................29, 31

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*DOT v. Pub. Citizen*,
  541 U.S. 752 (2004).....................................................................8, 16, 17, 20, 31

*Esch v. Yeutter*,
  876 F.2d 976 (D.C. Cir. 1989)..................................................................42

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985)................................................................................29

*Found. on Econ. Trends v. Heckler*,
  756 F.2d 143 (D.C. Cir. 1985)..................................................................30

*Fox Television Stations, Inc. v. FCC*,
  280 F.3d 1027 (D.C. Cir. 2002).................................................................33

*Friends of Capital Crescent Trail v. FTA*,
  877 F.3d 1051 (D.C. Cir. 2017).................................................................20

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975)..................................................................26

*Heartland Reg'l Med. Ctr. v. Leavitt*,
  415 F.3d 24 (D.C. Cir. 2005)....................................................................33

*Heartland Reg'l Med. Ctr. v. Sebelius*,
  566 F.3d 193 (D.C. Cir. 2009)..................................................................34

*Heckler v. Chaney*,
  470 U.S. 821 (1985)................................................................................43

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
  702 F.3d 1156 (10th Cir. 2012) ...............................................................25

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
  475 F.3d 1291 (D.C. Cir. 2007).................................................................42

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989)...........................................................................19, 34

*Massachusetts v. Microsoft Corp.*,
  373 F.3d 1199 (D.C. Cir. 2004).................................................................17

### TABLE OF AUTHORITIES *(continued)*

Page(s)

*Middle Rio Grande Conservancy Dist. v. Norton,*
   294 F.3d 1220 (10th Cir. 2002) ..........................................29

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010)..................................................14, 43

*Myersville Citizens for a Rural Cmty. v. FERC,*
   783 F.3d 1301 (D.C. Cir. 2015)............................16, 20, 24

*NAACP v. Jefferson Cty. Branch v. U.S. Sugar Corp.,*
   84 F.3d 1432 (D.C. Cir. 1996) ...........................................5

*Nat'l Archives & Records Admin. v. Favish,*
   541 U.S. 157 (2004)..................................................29, 37

*Nat'l Audubon Soc'y v. Hoffman,*
   132 F.3d 7 (2d Cir. 1997) .................................................29

*Nat'l Comm. for the New River v. FERC,*
   373 F.3d 1323 (D.C. Cir. 2004) .......................................19

*Nat'l Tank Truck Carriers, Inc. v. EPA,*
   907 F.2d 177 (D.C. Cir. 1990) .........................................42

*Nat'l Parks Conservation Ass'n v. Semonite,*
   916 F.3d 1075 (D.C. Cir. 2019)...................... 2, 12, 14, 15, 17, 24,
      25, 26, 27, 28, 30, 31

*Neb. Dep't of Health & Human Servs. v. HHS,*
   435 F.3d 326 (D.C. Cir. 2006) .........................................16

*New York v. NRC,*
   681 F.3d 471 (D.C. Cir. 2012)....................9, 14, 17, 18, 19, 25

*NRDC v. NRC,*
   606 F.2d 1261 (D.C. Cir. 1979) .......................................37

*O'Reilly v. U.S. Army Corps of Eng'rs,*
   477 F.3d 225 (5th Cir. 2007) ...........................................30

*Oglala Sioux Tribe v. NRC,*
   896 F.3d 520 (D.C. Cir. 2018).........................34, 37, 38, 42

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*PEER v. Hopper,*
 827 F.3d 1077 (D.C. Cir. 2016) ..........................................................37

*River Rd. All., Inc. v. U.S. Army Corps of Eng'rs,*
 764 F.2d 445 (7th Cir. 1985) .............................................................26

*Robertson v. Methow Valley Citizens Council,*
 490 U.S. 332 (1989)..............................................................3, 8, 23, 24

*Soc'y Hill Towers Owners' Ass'n v. Rendell,*
 210 F.3d 168 (3d Cir. 2000) .............................................................25

*Theodore Roosevelt Conservation P'ship v. Salazar,*
 616 F.3d 497 (D.C. Cir. 2010) ..........................................................16

*Town of Marshfield v. FAA,*
 552 F.3d 1 (1st Cir. 2008)...................................................................25

*WildEarth Guardians v. Conner,*
 920 F.3d 1245 (10th Cir. 2019) .........................................................20

*Winter v. NRDC,*
 555 U.S. 7 (2008)................................................................................43

*Wisconsin v. EPA,*
 938 F.3d 303 (D.C. Cir. 2019)......................................................39, 41

**STATUTES**

5 U.S.C. § 701(a)(2)................................................................................43

5 U.S.C. § 706(2)(A)...............................................................................16

28 U.S.C. § 1291.......................................................................................5

28 U.S.C. § 1292(a)(1)..............................................................................5

28 U.S.C. § 1331.......................................................................................5

28 U.S.C. § 1362.......................................................................................5

30 U.S.C. § 185.........................................................................................6

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

42 U.S.C. § 4332(C) .................................................................................8, 17

**REGULATIONS**

33 C.F.R. pt. 325, App. B(7) ........................................................................8

40 C.F.R. § 1500.1(c) .................................................................................30

40 C.F.R. § 1502.7 .....................................................................................33

40 C.F.R. § 1502.10(a)-(k) .........................................................................33

40 C.F.R. § 1502.11-.18 .............................................................................33

40 C.F.R. § 1502.21 ...................................................................................33

40 C.F.R. § 1508.9(a)(1) ............................................................................33

40 C.F.R. § 1508.9(a)(3) ............................................................................33

40 C.F.R. § 1508.27(a)-(b) ...................................................................20, 25

40 C.F.R. § 1508.27(b)(3)-(4) ....................................................................26

40 C.F.R. § 1508.27(b)(4) ..........................................................................11

40 C.F.R. § 1508.27(b)(8) ..........................................................................26

**OTHER AUTHORITIES**

Karen Clay et al., *External Costs of Transporting Petroleum
    Products: Evidence from Shipments of Crude Oil from North
    Dakota by Pipelines and Rail*, 40 Energy J. 55 (2019) ......................39

PHMSA, Leak Detection Study (2012),
    https://bit.ly/2VoDtAY ........................................................................21

# GLOSSARY

| | |
|---|---|
| DAPL: | Dakota Access Pipeline |
| EA: | Environmental Assessment |
| EIS: | Environmental Impact Statement |
| FONSI: | Finding of No Significant Impact |
| HDD: | horizontal directional drilling |
| NEPA: | National Environmental Policy Act |
| PHMSA: | Pipeline and Hazardous Materials Safety Administration |
| the Corps: | the U.S. Army Corps of Engineers |

# INTRODUCTION

After nearly four years of litigation during which Plaintiffs failed at multiple attempts to enjoin construction of a major oil pipeline, the district court ordered the pipeline shut down and directed preparation of an environmental impact statement ("EIS").  The court based this order on supposed controversy over possible oil spill consequences from a pipeline that has operated safely for more than three years.  Before the U.S. Army Corps of Engineers ("Corps") issued an easement for the Dakota Access Pipeline ("DAPL") to cross Corps-owned land at Lake Oahe—a small, man-made reservoir on the Missouri River, which is already crossed by many pipelines and utilities—it extensively studied both likelihood and impacts of a large oil spill on the 1.7-mile segment at issue.  The agency made a finding of no significant impact ("FONSI") after discounting the impacts by the "extremely low" likelihood of a large spill, A539—a methodology that this Court's precedent expressly allows.

The district court erred in multiple ways.  It misread the National Environmental Policy Act ("NEPA") to preclude a FONSI, and thus require an EIS, even though the agency concluded that the topics of supposed "high controversy"— principally the *consequences* of a large spill—would not change the FONSI due to the extremely low likelihood of a large spill combined with Dakota Access's ability to detect such a spill and shut the pipeline down quickly.  The court also misread a

1

recent opinion from this Court, *National Parks Conservation Association v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019), to require the agency to *resolve* all controversies to a Plaintiff's satisfaction, contrary to longstanding precedent requiring deference to agency expertise. The court improperly required an EIS without giving the agency the option of updating its already extremely detailed environmental assessment ("EA"). And the court vacated the easement under *Allied-Signal, Inc. v. NRC*, 988 F.2d 146 (D.C. Cir. 1993), and enjoined the pipeline's operation despite severe disruptive effects and the Corps' likely ability to reissue the easement even if it must first prepare an EIS.

The disruptive effects here are enormous and unprecedented. This is the first NEPA decision to order an operational pipeline shut down during remand to the agency. The disruption would be massive. DAPL is the safest, most environmentally friendly option for bringing to market around 40% of North Dakota's, and 4.5% of the nation's, crude oil production. Since 2017, it has transported more than half a billion barrels of oil without a single spill from its nearly 1,200 miles of pipeline. Shutting it down during a remand would cost billions of dollars to third parties, including state, local, and tribal governments that have come to depend on it for billions each year in tax and royalty revenue. Thousands of employees in the oil industry alone would be out of work. Agricultural and other industries would suffer major disruption from trying to replace the pipeline with rail

or truck—transportation options that threaten greater environmental harm and human fatalities than pipelines. No agency would be tasked with reviewing those risks, turning a shutdown into the judicial equivalent of a major federal action with no regulatory oversight or environmental agency review or approval. A890-91.

The court erred in granting summary judgment in the first place. NEPA is a procedural statute designed to compel agencies to face the environmental consequences of their actions, not to force any particular action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). In deciding whether an EIS is required—that is, whether a federal action will significantly impact the environment—the agency considers *inter alia* a list of ten factors, including the degree to which any environmental impact is highly controversial. The Corps applied these factors and concluded that the likelihood of a large discharge of oil at Lake Oahe was too small to warrant an EIS. Indeed, even putting aside DAPL's many extra safety features and its location more than 90 feet below the lakebed, extensive government data prove that the chance of a major leak at Lake Oahe—*i.e.*, one materially different from any that the Corps has already extensively modeled— is 1 occurrence in nearly 200,000 years. The district court ordered the Corps to perform an EIS without seriously questioning this minimal risk of a large spill. Instead, the court flyspecked the Corps' analysis, identifying four discrete

controversies—largely concerning the *impact* of even *more unlikely* "perfect storm" events—that it believed remained unresolved.

In giving these perceived controversies dispositive weight, the court expanded the "highly controversial" factor, elevated its importance, and imposed heightened scrutiny on agency decisions not to prepare an EIS. The court failed to defer to the Corps' expert judgment to resolve disputes about a possible spill's likelihood and potential magnitude, and put any controversy in context. Instead, it held that an EIS is always required when the environmental impact of agency action is disputed—despite a very low likelihood—unless an agency "'succeed[s]'" in "convincing" the court and parties opposing the project that its action is not highly controversial. A107, 130. The court gave parties a heckler's veto over agency decisions to forgo an EIS and invaded the Corps' province to resolve scientific controversies in making that decision. That ruling directly conflicts with binding precedent and bedrock administrative law principles.

The district court also erred in its remedy, ordering the Corps to prepare an EIS even though the Corps could revalidate its EA and FONSI on remand. It then vacated the easement, reasoning that the resulting catastrophic economic harms *support* vacatur because they give NEPA more "bite." Contrary to the established test for vacatur under *Allied-Signal*, the court refused to consider the likelihood that the Corps would ultimately reinstate its easement on remand; it wrongly discounted

the devastating economic consequences of its decision; and it ignored the environmental consequences and the threat to human life of forcing North Dakota oil producers to switch to rail transportation or shut in their wells. Finally, the court ordered Dakota Access to cease operations and drain the entire pipeline, without even mentioning the demanding test for issuing an injunction. This usurped the Corps' authority to determine how to respond to the encroachment on federal property that resulted from vacating the easement.

The impossible standard set by the district court's unprecedented ruling would discourage major infrastructure investment, waste government resources on needless and costly review of remote and speculative environmental harms, and pose immediate economic and environmental harm far beyond the astronomically unlikely spill risk that Plaintiffs claim they seek to prevent. The decision should be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs asserted jurisdiction in the district court under 28 U.S.C. §§ 1331 and 1362. Dakota Access timely filed its notice of appeal on July 6, 2020, A821-22, the day the district court issued its remedy order, A138-39. This court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1), and pendent to the Corps' consolidated appeal, *see NAACP v. Jefferson Cty. Branch v. U.S. Sugar Corp.*, 84 F.3d 1432, 1436 (D.C. Cir. 1996).

5

## STATEMENT OF THE ISSUES

1.      Did the district court err in holding that the Corps violated NEPA in granting Dakota Access an easement under the Mineral Leasing Act?

2.      Did the district court err or abuse its discretion, in granting relief, by ordering the Corps to complete an EIS, vacating the easement pending remand, and requiring Dakota Access to shut down and empty its pipeline?

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are reproduced in the separately bound Addendum.

## STATEMENT OF THE CASE

**1.** For more than three years, DAPL has safely transported approximately 200 million barrels of crude oil annually from North Dakota to Illinois, for further pipeline delivery to the Gulf Coast.  DAPL brings to market around 40% of the oil produced in North Dakota, which is second only to Texas in oil production, A1500, 1742-43, and DAPL has done so without *any* spills on its mainline, A1174, 1619. According to Plaintiffs' own expert, DAPL is even less likely to leak now that it has completed its start-up phase, A412, making DAPL among the safest crude oil pipelines in the country, A1165, 1170.

Plaintiffs challenged the Corps' decision to grant an easement under the Mineral Leasing Act, 30 U.S.C. § 185, that allows DAPL to cross federally owned

6

lands on each side of Lake Oahe in North Dakota.  The relevant pipeline segment measures 1.73 miles between two valves.  A1166.  Each valve has built-in, state-of-the-art pressure sensors, part of a system capable of detecting not only a leak down to 0.75% of flow rate within 45 minutes, but also smaller leaks well before they could cause environmental harm.  A1166, 1168, 1622.  The horizontal directional drilling ("HDD") installation method used to install this segment—illustrated below—"'virtually eliminate[s] the ability of a spill to interact with the surface water.'"  A1830.  Leaked oil would follow the bore-hole path to land on the sides of the Lake, rather than rise 92 feet to the lakebed through low-permeability alluvial materials.  A876, 1181, 1830-36, 2234.  HDD is so safe that federal data show only a *single*, 1.7-barrel leak reported between 2010 and 2018 on any crude oil pipeline installed using HDD.  A876, 1631, 1836.



A874.

Only Plaintiffs' NEPA challenge is at issue here.  NEPA requires federal

agencies to evaluate the environmental effects of major federal actions. If an action will "significantly" affect the "quality of the human environment," the agency must prepare an EIS; otherwise the agency may prepare an EA and Finding of No Significant Impact ("FONSI"). 42 U.S.C. § 4332(C). NEPA does not "mandate particular results," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); it "imposes only procedural requirements." *DOT v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004).

   **2.** The Corps' environmental review under the previous administration—culminating in an EA and FONSI in July 2016—was extensive. A combined EA and FONSI document "normally should not exceed 15 pages." 33 C.F.R. pt. 325, App. B(7). This EA was 163 pages, with 700 pages of appendices. A448-610. That allowed the Corps to address, in a comprehensive manner, efforts to preserve historical and cultural resources and issues related to the environment and environmental justice. A476, 527-39, 557. Among other things, the EA extensively addressed potential impacts on 25 distinct environmental aspects, A475-549; considered cumulative impacts, A550-59; and analyzed six categories of alternatives to the Lake Oahe crossing, including a no-action alternative, A457-74.

   The Corps substantial tribal consultation "exceeded" its legal obligations. A211. In fact, an entire EA section addresses consultation. The Corps carefully tracked comments from the Tribes and others to show how the EA addressed each

concern, including spill risks at Lake Oahe. A634.

The EA also addressed both the likelihood and consequences of a hypothetical worst-case spill at Lake Oahe, including through project-specific models designed in accordance with Pipeline and Hazardous Materials Safety Administration ("PHMSA") regulations. A1929-30, 1960-61. The Corps determined that although a large spill into Lake Oahe could have serious consequences, its *likelihood* was "extremely low" given "the engineering design, proposed installation methodology, quality of material selected, operations measures and response plans," A539, and Dakota Access had adequate measures in place to ensure that any harm to Plaintiffs would be "temporary" and "limited," A1818, 2033-34. The Corps' decision not to prepare an EIS before it permitted construction at Lake Oahe thus followed from this Court's instruction that, "after the agency examines the consequences of the harm in proportion to the likelihood of its occurrence, the overall expected harm could still be insignificant and thus could support a FONSI." *New York v. NRC*, 681 F.3d 471, 482 (D.C. Cir. 2012).

**3.** Even before the Corps could issue the required easement, Plaintiffs sought to halt the pipeline's construction through injunctive relief, by mobilizing highly politicized protests, and by lobbying political appointees. A164, 279-80, 101.

Plaintiffs' legal efforts failed. Both the district court and this Court denied Plaintiffs' requests for emergency injunctive relief under the National Historic

Preservation Act, A196, 221; D.C. Cir. No. 16-5259, Doc. 1640062 (Oct. 11, 2016), and the Religious Freedom Restoration Act, A3-4; D.C. Cir. No. 17-5043, Doc. 1666652 (Mar. 18, 2017). Plaintiffs never sought preliminary injunctive relief under NEPA.

Plaintiffs' lobbying efforts with political appointees met with success: The previous administration abruptly reversed itself in September 2016, announcing it would reexamine its NEPA obligations. A101. In October, the Corps reaffirmed it was simply reviewing its "decision making to confirm compliance." A231. In December, an Army political appointee agreed that "'the Corps' prior reviews and actions have comported with legal requirements,'" but she used her position of authority to keep the Corps from issuing the easement. A18. Then, in the outgoing administration's final days, the Army (without agreement from the Corps itself) bowed to Plaintiffs' pressure and published a notice of intent to prepare an EIS. A101.

During the new administration, the Corps completed reviewing materials Plaintiffs had submitted only *after* the Corps issued the EA, FONSI, and construction permit, and found that none "would require supplemental NEPA documentation." A273-75. The Corps thus restored the agency's original, expert judgment, and announced on February 3, 2017 that it would deliver the easement. A18-19. Pipeline construction was completed in March, and operations began June 1, 2017. A19. The

litigation's focus shifted to NEPA and supposed leak risks.

**4.**  In June 2017, the district court granted Dakota Access and the Corps partial summary judgment on Plaintiffs' NEPA claim.  A3.  It held that the Corps had "substantially complied with NEPA," A4, and affirmed the Corps' ultimate "conclusion that the risk of a spill is low," A32.  The court nonetheless remanded for the Corps to address three discrete issues that, in the court's view, were "not adequately consider[ed]" in the EA.  A4, 441.  The one relevant here is "the degree to which" the project's effects are "highly controversial"—one of many factors that "should be considered" in assessing whether a project will have significant environmental impacts.  40 C.F.R. § 1508.27(b)(4).  The court determined that the Corps had failed to consider whether criticisms that Plaintiffs submitted *after* the EA was published rendered the project highly controversial.  A35-36.  "Aside from the discrete issues that" were "the subject of the remand, the Court conclude[d] that the Corps complied with its statutory responsibilities," A92, including its tribal-consultation obligations, A83-92.  The court declined to vacate the easement pending remand, allowing the pipeline's continued operation.  A441.

**5**.  Like the Corps' path to its original decisions, its remand process went far beyond what the law requires.  In particular, the Corps asked Dakota Access to prepare extensive additional spill modeling addressing the effects of a hypothetical worst-case spill calculated using the PHMSA-approved method.  A445.  The

modeling confirmed that even an extremely large spill would not affect Plaintiffs' water intakes, and would have only "temporary" and "limited" effects on Plaintiffs' use of the Lake. *E.g.*, A1818, 2033-34.

The Corps completed its 280-page remand analysis on August 31, 2018, revalidating the EA and FONSI, A1958-2097. The remand was the Corps' first attempt to formally address all *339* of Plaintiffs' post-EA criticisms, and it did so in great detail. *Id.* The Corps acknowledged there "may be other methods for predicting oil spill effects" beyond the existing extensive models, but concluded that it was "not likely that employing further methods will result in substantively different views or information that is more comprehensive." A1956-57.

**6.** Plaintiffs again challenged the Corps' conclusions under NEPA. In March 2020, the district court ordered the Corps to prepare an EIS because "the pipeline's 'effects on the quality of the human environment'" remained "'highly controversial.'" A131. Citing "new" and "significant guidance" from *National Parks Conservation Association v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019)—a decision issued six months *after* the Corps completed the remand, A442—the court found it insufficient for the Corps to have "'consider[ed]'" Plaintiffs' objections to its analysis and methodologies. A97, 110. Instead, the court required the Corps to "'succeed' in resolving the points of scientific controversy" that Plaintiffs' consultants raised. A112-13.

The court identified four instances in which the Corps purportedly had "not 'succeeded' in 'resolving ... controversy'" regarding its "'analytical process and findings,'" (alteration omitted), and ordered an EIS on that basis alone.  A113, 130-31.  These were: (1) DAPL's "efficacy" in detecting slow leaks, A114-17; (2) the safety record of DAPL's operator, Sunoco, including incidents pre-dating Sunoco's merger with, or sale of relevant pipelines to, DAPL's part-owner, Energy Transfer, A117-19;  (3) spill-response  efforts  under  winter  conditions,  A119-21;  and (4) certain inputs for the EA's worst-case analysis, A125, 127, 129.

The district court ordered further briefing on the remedy.  The Corps, fifteen states, industry members, and Dakota Access submitted briefs and expert declarations extensively documenting the catastrophic consequences that a pipeline shutdown would have on the industry, the nation, and the environment, including billions of dollars in lost oil and tax revenues, thousands of lost jobs, and increased spill risks and fatalities.  *E.g.*, A676-92, 741-68; *see also* D.E. 507; 509-1.  The district court recognized generally "the serious effects that a DAPL shutdown could have for many states, companies, and workers," but did not address any of this extensive evidence in any meaningful way, and it nevertheless vacated the easement, concluding that considering these consequences would "subvert the structure of NEPA."  A156-57.  The court also issued an injunction—ordering Dakota Access to "shut down the pipeline and empty it of oil" in 30 days.  A138-39.

This Court denied Dakota Access's request to stay vacatur pending appeal, but stayed the requirement to shut down and empty the pipeline, because the "district court did not make the findings necessary for injunctive relief" "'under the traditional four-factor test.'" Doc. 1855206, at 1 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010)).

## SUMMARY OF ARGUMENT

**I.**    The Corps' decision to forgo an EIS complied with NEPA because the Corps reasonably concluded—based on extensive modeling, an EA, and added remand analysis—that the probability of a high-consequence spill reaching Lake Oahe is "extremely low."  A539; A1936.  The four controversies the district court identified focus on the *magnitude*, not the likelihood, of an extremely unlikely spill and thus do not alter that conclusion under this Court's precedent.  *New York v. NRC*, 681 F.3d 471, 479 (D.C. Cir. 2012).  The district court's affirmance of the Corps' low-spill-risk conclusion thus should have ended this case.

The district court concluded otherwise by misreading this Court's *Semonite* decision to require an EIS *whenever* controversy remains after an agency prepares an EA.  But *Semonite* never held that controversy alone is decisive, much less purported controversy about extremely low-probability events.  And that case involved withering, unanswered criticisms from two expert federal agencies, not comments from litigation-driven consultants lacking oil-spill modeling expertise.

14

The district court's misapplication of *Semonite* gives opponents to any project exactly the kind of heckler's veto this Court and others have rejected.

**II.** The district court's remedial orders independently warrant reversal.

**A.** NEPA leaves to the Corps the choice between an EIS and an amended EA. The court's belief that more explanation was required on four controversies does not justify intruding on that prerogative, particularly when expert evidence submitted at the remedy stage (which the court ignored) demonstrates that the Corps readily *can* provide through an amended EA the explanation the district court sought.

**B.** The order vacating the easement cannot stand, even if an EIS were required. The court failed to address the "serious possibility" that the Corps can "substantiate" its easement decision by resolving any controversies on remand, and it gave short shrift to the "disruptive consequences" vacatur would cause if the pipeline shuts down. *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). The court gave legally erroneous reasons for categorically discounting economic losses totaling billions of dollars and thousands of jobs; it ignored undisputed environmental harms, including increased spill risks and fatalities from other transportation modes; and it subordinated those harms to Plaintiffs' remote, unsubstantiated concerns about a once-in-human-existence spill. Each error warrants reversal.

15

**C.**  Finally, the district court's intrusive injunction—requiring the Dakota Access to "shut down the pipeline and empty it of oil," A139—has no basis in law. The court did not even mention the demanding test for injunctions, nor could Plaintiffs prove a likelihood of irreparable harm given the miniscule risk of a large spill.  Regardless, Plaintiffs have no cause of action to enjoin private activity on federal lands, and the APA leaves to the Corps' unreviewable discretion whether to enforce its own property rights.

## STANDARD OF REVIEW

In NEPA cases, a grant of summary judgment is reviewed *de novo*.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010).  A court's "role in reviewing an agency's decision not to prepare an EIS is a 'limited' one."  *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015).  A court cannot "'flyspeck' the agency's findings," *id*.  at 1323, and the agency's decision "can be set aside *only* upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *DOT v. Pub. Citizen*, 541 U.S. 752, 763 (2004) (quoting 5 U.S.C. § 706(2)(A)) (emphasis added).

This Court reviews equitable remedial orders "for abuse of discretion," with legal errors reviewed *de novo*.  *Neb. Dep't of Health & Human Servs. v. HHS*, 435

F.3d 326, 330 (D.C. Cir. 2006); *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1207 (D.C. Cir. 2004).

## ARGUMENT

### I.    The Corps Complied With NEPA

NEPA requires an EIS only for federal actions that will "significantly affec[t] the quality of the human environment."  *DOT v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004) (quoting 42 U.S.C. § 4332(C)).  The Corps reasonably determined in its EA and FONSI that the risk of a high-consequence spill at Lake Oahe was too low to meet this standard.  A500, 539; A1936.  That determination adequately accounted for each controversy the district court identified.  The district court erred in holding that *National Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019), required more.

### A.    The Corps Reasonably Concluded That The Lake Oahe Crossing Would Not Significantly Impact The Environment

The Corps' FONSI rests on the established rule that "[a]n agency may find no significant impact if the probability [of harm] is so low as to be 'remote and speculative,' or if the combination of probability and harm is sufficiently minimal." *New York v. NRC*, 681 F.3d 471, 478-79 (D.C. Cir. 2012).  As the Corps recognized, PHMSA data show that large spills are "extremely uncommon":  Of 156 reported hazardous-liquid accidents since 2010 involving pipelines with diameters of 16 inches or more, 53% involved fewer than 4 barrels, and 95% were below 7,600

17

barrels. A1835-36. The risk of a spill on an oil pipeline installed using HDD—such as the Lake Oahe crossing—is lower still: just one 1.7-barrel leak nationwide between 2010 and 2018. A1836. And the chances of oil actually "reaching Lake Oahe itself" are "even lower" because "[i]nstallation of the pipeline at a depth of 92 feet below the bottom of Lake Oahe 'virtually eliminat[es] the ability of a spill to interact with the surface water.'" A1875.

The Corps thus reasonably concluded that DAPL's "engineering design, proposed installation methodology, quality of material selected, operations measures and response plans" combine to make the risk of oil reaching Lake Oahe "extremely low." A539; A1936. The district court agreed, calling the spill risk "minimal," A427, and upholding the Corps' ultimate "conclusion that the risk of a spill is low." A32. The "low" probability of a spill alone made an EIS unnecessary. *New York*, 681 F.3d at 478.

The Corps reinforced this conclusion by analyzing the *consequences* of an extremely-low-likelihood worst-case spill, and finding they would be temporary and localized. Applying PHMSA's conservative methodology, A1960, the Corps calculated that even a complete severing of the pipeline would spill no more than ███ barrels of oil. A1838. Three-dimensional modeling, under nearly 100 weather scenarios, showed the trajectory for that volume even if released directly into the lake and left unmitigated for 10 days, A1836-40—far beyond the "6 hour

18

response time" to which Dakota Access "commit[ted]" in its comprehensive spill-response plan, A2036, 491. The modeling confirmed that even such a spill would *never* reach the Tribes' water intakes, A1877, and 95% of the time would not significantly impact wildlife, A1855. Even a "localized fish kill" under outlier perfect-storm weather conditions would be "of limited scale and of temporary duration." A1860; A2104.

The Corps acknowledged that "there may be other methods for predicting oil spill effects," but emphasized that "further methods" would not "result in substantively different views or information that is more comprehensive than what the Corps considered." A1956-57. The Corps thus thoroughly considered the impacts of a "high consequence" spill, A544, concluding that the improbability of an occurrence and the adequacy of Dakota Access's mitigating measures made an EIS unnecessary.

The Corps' "'evaluati[on]'" of this "'scientific data'" is entitled to an "'extreme degree of deference,'" *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004), especially because it implicates "'a high level of technical expertise,'" *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989). The Corps' "weighing of the probability and consequences" likewise merits "considerable deference," *New York*, 681 F.3d at 482. The district court's role was merely to "ensure that 'no arguably significant consequences have been ignored,'"

not to "'flyspeck' the [Corps'] findings in search of 'any deficiency no matter how minor.'" *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322-23 (D.C. Cir. 2015). Because the Corps' careful consideration of the likelihood and magnitude of a spill at Lake Oahe was not "'arbitrary'" or "'capricious,'" *DOT*, 541 U.S. at 763, demanding more was error.

## B.    The Corps Adequately Addressed The Controversies The District Court Identified

The district court grounded the EIS requirement on the Corps' supposed failure to "resolve" four discrete spill-related controversies. A110. Agencies assess the "significance" of environmental effects for EIS purposes by considering both the "context" of the action and the "intensity" of its impact under 10 factors, including whether the impact is "highly controversial." 40 C.F.R. § 1508.27(a)-(b). But "[a]gencies are not always required to give 'point-by-point responses' to every objection raised." *Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1062 (D.C. Cir. 2017). Once the Corps "reasonably concluded that [a spill was] unlikely," it could "properly conclude that there was no legitimate controversy" requiring an EIS. *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1263 (10th Cir. 2019). None of the four controversies altered the low-risk/high-consequence premise of its FONSI.

1. <u>Leak Detection Systems</u>: The district court assumed that leaks below 1 percent would go undetected. A116. But nationwide PHMSA statistics showing the

infrequency of large spills, *see supra*, at 17-18, already accounted for the impact of detection failures for *all* leak sizes.  A1835.

The administrative record also shows that DAPL's leak-detection systems would out-perform the much-older pipelines included in PHMSA's data-set. DAPL's computational pipeline monitoring ("CPM") system performs state-of-the-art "real-time" modeling based on "pipeline pressure, flow, and pipeline and ground temperature data" received every six seconds from the pipeline's supervisory control and data acquisition ("SCADA") system.  A2022.  The Corps concluded that these systems can "detec[t] leaks down to 1 percent or less than 1 percent of the pipeline flow rate within approximately 1 hour or less."  A1944; *see* A1991, 2055. Separately, even if "pressure measurements do not show a significant drop," a detectable meter imbalance and "line pack" measurements can detect "shortage" as little as "100 bbls" of oil.  A2022-23.

The court also misread a 2012 PHMSA study to conclude that CPM systems have "an 80% failure rate."  A115.  The study instead merely reported that *other* leak-detection methods—which DAPL also deploys—were sometimes even quicker at detecting leaks.  PHMSA, Leak Detection Study, at 2-10–2-11 (2012), https://bit.ly/2VoDtAY.  Nor does the study—which included data from "older pipelines"—support any conclusion about detection under "modern pipeline standards."  A1990.  Instead, PHMSA data cited by the Corps confirm that since

21

2010, *not one* spill exceeding 5,000 barrels has escaped detection on *any* CPM-enabled pipeline segment manufactured after 1968.  A1147-48.

The supposed controversy over slow leaks did not prevent the Corps from basing its FONSI on the very low likelihood of a high-consequence event.

2.  <u>Operator Safety Record</u>:  The Corps also adequately addressed Sunoco's safety history.  Nothing in the administrative record suggests Sunoco's record for any spill size differs materially from that of other operators.  Plaintiffs cite the *number* of leaks attributed to Sunoco from 2010 to 2016, A118, but that is consistent with Sunoco's position as one of the largest pipeline operators.  A1611-12.  Sunoco is in line with industry averages on the relevant, apples-to-apples metric—spills *per mile* of pipeline operated.  A1831.  The court also ignored improvements to Sunoco's safety culture and training since Energy Transfer's acquisition, A2056, including adopting the same safety-management standards Plaintiffs prefer, *compare* A1176, *with* D.E. 433-2, at 31; and numerous features that make DAPL safer than other Sunoco pipelines, including valve assemblies, SCADA, and others "specific to Lake Oahe," A2052-53; *supra*, at 7.

**3.**  <u>Winter Conditions</u>:  The Corps also properly accounted for the possibility that "winter conditions would delay response [spill] efforts," A120-21, by including in each spill-model iteration a 10-day response delay, A2232.  In unannounced drills, clean-up teams have responded well ahead of the "6 hour response time" that

PHMSA requires, A2036, 491, 1174, and nothing suggested that winter conditions would cause a delay even approaching the 10-day mark.

The district court also found the Corps' response on this topic "insufficient to resolve the points [Plaintiffs] raised." A120. The court relied here on one expert's observation that a "study cited by the Corps"—showing that "ice may benefit spill response"—"also indicated the ways in which winter may simultaneously hinder it." *Id.* But the Corps *agreed* with this view that winter conditions help a spill response in some ways while hurting in others. The district court even quoted the Spill Model Report itself as acknowledging this tradeoff. A120-21. Moreover, the Corps modeled spills during winter conditions before making its no-significant-impact finding.

4. <u>Worst-Case Discharge</u>: The district court's criticisms of the Corps' ███-barrel worst-case-discharge calculation is likewise unsupportable. NEPA does not require a "'worst case analysis,'" *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354 (1989), and the court's criticisms do not alter the Corps' ultimate low-risk/high-consequence analysis.

Over the past decade, on an average of 67,216 miles of pipeline operating nationwide each year, there have only been *two* spills materially larger than ███ barrels. A1152-53. Both were significantly smaller than the spill that Dakota Access planned for in its emergency response plan. A1159-60, 1187, 1242. Even

were DAPL no safer than the average pipeline, therefore, the chance of a spill beyond Dakota Access's response capacity is essentially zero, and the chance of exceeding the Corps' worst-case discharge on the 1.7-mile Lake Oahe crossing at issue in this case is less than 0.000003 per year, or once in 193,972 years—about the amount of time since the dawn of humanity.  A1152-53.  DAPL's safety features, construction method, and location drive the odds even lower.  *See supra*, at 7.

Quibbling about the precise worst-case discharge is thus textbook "'flyspeck[ing].'"  *Myersville*, 783 F.3d at 1323.  "[O]ne can always conjure up a worse 'worst case' by adding …. additional variable[s]," which is precisely why the regulations governing NEPA analysis eliminated the nebulous requirement that agencies perform a "worst case analysis."  *Robertson*, 490 U.S. at 354, 356 n.17 (quotation marks omitted).  NEPA was intended to ensure intelligent consideration of issues, not "particular results" or agreement with Plaintiffs' opposition or merits position.  *Id.* at 350.  The Corps met that burden.

### C.    *Semonite* Does Not Mandate An EIS

The district court misread this Court's decision in *Semonite* as license to deprive expert agencies of the deference the law requires.  It held that, under *Semonite*, the Corps must not only "'conside[r]'" objections, but "'succeed' in resolving" all "points of scientific controversy."  A110, 113.  That was error.  *Semonite* does not require agencies to "do away with [any] controversy" to plaintiffs'

satisfaction, or disprove that any "'dispute exists'" before making a no-significant-impact finding.  A108, 129.

To start, "the existence of a controversy is only one of the ten ['intensity'] factors," *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 184 (3d Cir. 2000), that the Corps must "conside[r]," along with "context," when deciding whether the environmental impacts are "significant," 40 C.F.R. § 1508.27(a)-(b). "[C]ontrovery" alone "is not decisive"—it is "merely to be weighed." *Town of Marshfield v. FAA*, 552 F.3d 1, 5 (1st Cir. 2008).  And the mere fact that "a project is controversial" "does not mean the Corps must prepare an EIS." *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. 2012).  The context here is a disagreement over the consequences of an event so unlikely that "after the agency examine[d]" the asserted consequences of a harm "in proportion to the likelihood of its occurrence, the overall expected harm could still be insignificant" and thus "support a FONSI." *New York*, 681 F.3d at 482.  If the likelihood of nuclear fuel rods catching fire can be low enough to not require an EIS, *see id.* at 478-79, 482, the Corps was free to issue an easement without first satisfying Plaintiffs that it had precisely calculated every imagined iteration of an exceedingly unlikely spill.

*Semonite* did not purport to overrule *New York*.  It held that an EIS was required for permitting of electrical transmission lines and massive steel-lattice

25

towers—which all agreed would "'intrude upon the viewsheds of historic properties and on a unique and highly scenic section of the James River'"—based on three distinct "intensity" factors:  the degree of controversy, the James River's "[u]nique characteristics," and the "advers[e] [e]ffect" on that historically protected site.  916 F.3d at 1081, 1083-87 (citing 40 C.F.R. § 1508.27(b)(3)-(4), (8)).  These factors *together*—not controversy alone—showed that the project would "significantly impact historic resources."  *Id.* at 1087.  Here, by contrast, the district court never questioned that the other NEPA factors all supported a FONSI.  *See* A620; D.E. 159, at 16-19 (summarizing EA's discussion of each CEQ factor).

Context aside, *Semonite* also reaffirmed the longstanding principle that actions are not highly controversial simply because "some people may be highly agitated and be willing to go to court."  916 F.3d at 1083 (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975)).  Criticisms only rise to the level of high controversy when the record casts "'substantial doubt on the adequacy of the agency's methodology and data.'"  *Biodiversity Conservation All. v. U.S. Forest Serv.*, 765 F.3d 1264, 1275 (10th Cir. 2014).  To hold otherwise would give a project's opponents "the environmental counterpart to the 'heckler's veto' of First Amendment law."  *River Rd. All., Inc. v. U.S. Army Corps of Eng'rs*, 764 F.2d 445, 451 (7th Cir. 1985).

The critical factor in *Semonite*, instead, was that "federal and state agencies with relevant expertise harbor[ed] serious misgivings," not just about the Corps' mode of analysis, but also its ultimate misguided substantive decision to issue a permit. 916 F.3d at 1077. *Semonite* thus focused on "critical comments" from two subject-matter-expert federal agencies that excoriated the Corps' overall methodology as "'superficial,'" "'scientifically unsound, inappropriate, and completely contrary to accepted professional practice,'" and opined that the "adverse effect" on a landscape of "'transcendent national significance'" "'could not be mitigated.'" *Id*. at 1080-81, 1083-84, 1086 (alteration omitted). *Semonite* did not rule that criticisms from other organizations would alone render the Corps' decision highly controversial. *Id*. at 1086.

Here, by contrast, Plaintiffs—not federal agencies—pursued each topic of controversy. *E.g.*, A114 (citing "[e]xperts for both Standing Rock and Cheyenne River"). An Army political appointee briefly bowed to Plaintiffs' lobbying efforts and published a notice of intent to prepare an EIS, A258-61, but Corps experts— across two successive administrations—consistently maintained that an EA sufficed based on a FONSI, A448 (July 2016 EA); A1818 (August 2018 remand decision).

The court relied on just two comments from federal agencies, and neither questioned the Corps' ability to justify the Lake Oahe easement. In the first, Interior raised no specific criticism at all; it merely suggested that the Corps' *draft* EA had

not yet "adequately justif[ied]" the decision to forgo an EIS.  A385.  EPA likewise commented on the draft EA, which the Corps fully addressed without EPA's objection.  A388-92.  *No* agency opined on this topic *after* the Corps performed substantial additional analysis on remand, nor has any federal agency ever questioned the Corps' overall conclusion that the *likelihood* of a large spill near Lake Oahe is small enough to allow an easement.

Finally, the court never explained why *Semonite* extends to comments almost entirely sourced from litigation-driven consultants because the challengers themselves lack documented expertise in oil-spill modeling.  A114 (court equating Plaintiffs with expert federal agencies).  If private consultants can force an EIS just by burying an agency in objections that the agency—in its expertise—finds meritless or inconsequential, they have precisely the heckler's veto that *Semonite* rejected.

The district court's reliance on *Semonite* to expand the highly controversial factor was therefore unwarranted.  The Corps' response to Plaintiffs' criticisms was adequate to justify its FONSI.  Summary judgment should be reversed.

## II.    The District Court's Remedies Are Unwarranted

The district court also faltered at every step in awarding relief.  Rather than requiring an EIS, vacating the easement, and enjoining DAPL's continued operation, the court should have allowed pipeline operations to continue while the Corps addresses any unresolved controversies in its expert discretion.

### A.    An EIS Is Unnecessary

NEPA leaves the choice between an EIS and an amended EA and FONSI to the Corps, not the district court.  When a court finds an agency decision insufficiently reasoned or supported, "the proper course" ordinarily is "to remand to the agency for additional investigation or explanation."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  The exceptions are "rare," because agencies are trusted to fix their legal errors when identified, *id.*, consistent with the presumption of regularity to which agencies are entitled, *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004).  These "bedrock principles of administrative law" hold even when a court has "identified significant inconsistencies and gaps in the [agency]'s rationale."  *Cty. of L.A. v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999).  And they hold tighter where, as here, the agency "has not yet had an opportunity to explain" something.  *Banner Health v. Price*, 867 F.3d 1323, 1357 (D.C. Cir. 2017).

The same standard applies under NEPA.  *E.g.*, *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1226 (10th Cir. 2002).  "'[A]rguably significant'" impacts or mere "uncertainty over whether the proposed project may have a significant impact" are *not* the rare circumstances necessary to order an EIS. *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 18 (2d Cir. 1997); *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1226 (9th Cir. 2008).  Compelling the "very costly and time-consuming" process of preparing an EIS, *Cronin v. DOA*, 919 F.2d

439, 443 (7th Cir. 1990), solely because the agency committed a curable error in the process of adopting a FONSI is wasteful and impinges on agency prerogatives, *Cf. Ctr. for Marine Conservation v. Brown*, 1993 WL 108944, at *6 (D.D.C. Mar. 29, 1993) (not requiring an EIS when it would be "counterproductive" given the "large amount of time, effort and expense"). NEPA's purpose "is not to generate paperwork." 40 C.F.R. § 1500.1(c). If proceeding without an EIS "remains open," therefore, the agency is entitled to pursue it. *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 154 (D.C. Cir. 1985). Only when "th[e] possibility" of a FONSI has been "entirely foreclosed" can a court order an EIS. *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 240 (5th Cir. 2007).

Here, after holding that four discrete controversies warranted "more explanation," A125, the court deprived the Corps of its chance to provide that explanation short of an EIS. The court's 2017 remand was the Corps' first attempt to formally address the 339 criticisms that Plaintiffs submitted post-EA. A35-36. Given the breadth of that task, the Corps cannot be faulted for failing to anticipate the court's specific concerns. Nor did the Corps have the benefit of the "significant guidance" that the district court took from this Court's post-remand decision in *Semonite*. A97. The district court erroneously stated that *Semonite* issued "[w]hile the remand in this case was ongoing," A109; instead, the remand was completed six months before the *Semonite* ruling, *see supra*, at 12. Because NEPA "imposes only

Material Under Seal Deleted

procedural requirements," *DOT*, 541 U.S. at 756-57, the Corps should have had at least *one* "opportunity to articulate" a "better explanation" in response to *Semonite* and the court's criticisms, *Cty. of L.A.*, 192 F.3d at 1023.

The record developed during the remedy briefing confirms, moreover, that the Corps could easily address the four controversies in an amended EA. *E.g.*, A1142, 1145-62, 1165-81; *see* D.E. 509-1, at 19-30. Specifically:

- DAPL's leak-detection systems are even better than the EA and the district court assumed, capable of detecting pinhole leaks down to 1% of the pipeline's flowrate within 45 minutes, and even smaller leaks well before they could cause environmental harm. A1166, 1168, 1621-22.

- Plaintiffs' attacks on Sunoco's safety record—for pipelines lacking DAPL's safety features and operated under different management—are irrelevant. Under Energy Transfer's ownership, Sunoco's incident rate has decreased by 50% in just two years, A1176, and Sunoco's largest spill—which pre-dates Energy Transfer's control, A1169-70—was still far smaller than the ███-barrel spill the Corps already analyzed, A116.

- Adverse weather conditions would *not* affect the Corps' conservative spill-detection or response-time assumptions. A1153-55, 1174-76.

- The Corps' worst-case-discharge modeling used conservative leak-detection-time estimates and *already* accounted for the kinds of human and machine error that the court identified. A1153-60, 1180-81.

- Further, DAPL's industry-leading safety record supports the Corps' conclusions about low spill risk, the effectiveness of DAPL's safety and detection systems, and Dakota Access's care in operating the pipeline. After more than three years of operation, DAPL is one of the safest pipelines in the country, with *no* spills on the 1,200-mile mainline—including the Lake Oahe crossing—and only seven small incidents at company facilities, all remediated and none exceeding two barrels. A1149, 1174-75.

The district court's July 6 opinion ignored this evidence showing the Corps' ability to offer the "explanation" found lacking in the March 25 opinion.  A125. And, although unnecessary, the Corps on remand could also proceed without an EIS through added modeling of slow leaks, winter response, or a greater worst-case discharge.  By denying the Corps the opportunity to conduct further analysis on these issues before it decided between an EA or an EIS, the court unlawfully usurped the Corps' discretion as to how to remedy its purported mistakes.

## B. Vacating The Easement Was Unwarranted And Will Be Highly Disruptive

Vacatur, which the court premised on its flawed decision to order an EIS, A148-53, was also error even if an EIS is required.  Before vacating agency action, courts must consider: (1) "'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly),'" and (2) "'the disruptive consequences of an interim change that may itself be changed.'"  *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).  "A strong showing of one factor may obviate the need to find a similar showing of the other."  *Am. Bankers Ass'n v. NCUA*, 934 F.3d 649, 674 (D.C. Cir. 2019).  Neither factor favored vacatur here.

### 1. The Court Failed To Consider The Corps' Ability To Justify Its Easement Decision On Remand

Under *Allied-Signal*'s first prong, if there is a "serious possibility" that the agency can "substantiate" its original decision, 988 F.2d at 151, reviewing courts

"generally limit themselves to remanding for further consideration" without vacatur, *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1047 (D.C. Cir. 2002). Here, vacatur was inappropriate because the Corps can easily substantiate its easement decision on remand even if it must prepare an EIS.

The Corps has done most of the work already. NEPA regulations establish a "standard format" for an EIS comprising eleven different components that the agency must analyze—for example, alternatives, environmental consequences, and mitigation measures. 40 C.F.R. §§ 1502.10(a)-(k), 1502.11-.18. The Corps' 441 pages of EA and remand analysis—backed by comprehensive reports, memoranda, and extensive appendices—include nearly every component required of an EIS. *E.g.*, A457-74 (alternatives); A457-559 (potential impacts on 25 aspects of the environment); A561-62, 569-77 (mitigation measures). The Corps' analysis dwarfs what even the most complex EIS contains. *See* 40 C.F.R. § 1502.7 (complex EIS "normally" is "less than 300 pages").

The district court already upheld most of the EA in its first summary judgment order. A4, 414. Thus, the Corps can—indeed, *must*—use those portions of the EA to "[f]acilitate preparation" of an EIS. 40 C.F.R. §§ 1508.9(a)(1), (3), 1502.21 (agencies "shall" incorporate by reference where appropriate). All that remains is for the Corps to "fil[l] the analytical gap[s] identified" by the court. *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005).

33

The Corps could easily do so.  None of the four controversies is likely to alter the Corps' ultimate "low-likelihood but significant-consequences" reasoning.  *See supra*, at 20-24.  Indeed, the Corps faces a *lower* burden during this remand if it must prepare an EIS.  To avoid an EIS, the district court required the Corps to "do away with [any] controversy" or disprove that a "'dispute exists.'"  A108, 129.  In an EIS, though, the Corps need only *choose* among disputed approaches, with those decisions entitled to substantial deference.   The Corps' "choice of … method[ology]"—even if controversial—will be left to its "wisdom and experience," *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 200-01 (D.C. Cir. 1991), and "dispute[s] … of fact" left to its "'informed discretion,'" *Marsh*, 490 U.S. at 377.

The district court did not consider this argument because it incorrectly limited its analysis to whether the Corps could substantiate its "decision not to prepare an EIS."  A150.  But the decision that an agency must "'justify'" under *Allied-Signal* is the one the court is considering "whether to vacate," *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009)—here, *the decision to issue an easement*, A150.  The relevant question is not whether the agency can justify the flawed decision-making *process* that the court has already found deficient—an impossible task—but whether the agency can "substantiate" the final action that would otherwise be vacated.  *Allied-Signal*, 988 F.2d at 151; *see also Oglala Sioux*

*Tribe v. NRC*, 896 F.3d 520, 526 (D.C. Cir. 2018) (agency could substantiate license of uranium mining project despite flawed NEPA process).  Vacatur is unwarranted because there is "at least a serious possibility" that the Corps "will be able to substantiate its" easement "decision," even following an EIS.  *Allied-Signal*, 988 F.2d at 151.

### 2.    The Court's Analysis Of Disruptive Consequences Was Erroneous

The district court also erred on *Allied-Signal*'s second prong, wrongly dismissing the "'disruptive consequences'" of its unprecedented order shutting down an active pipeline.  988 F.2d at 150-51.  The court acknowledged the severe economic disruption that vacatur would cause if it results in a shutdown, including *billions* in losses and *thousands* unemployed, but it wrongly discounted those severe consequences on meritless grounds.  The court further erred by ignoring undisputed evidence of massive environmental and human harms from a shutdown, including more spills and fatalities, and by crediting remote, unsubstantiated harms to Plaintiffs.

### a.    The Court Improperly Discounted Economic Disruption

Because shutting down an "operational" pipeline is "quite disruptive," *City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019), this Court has consistently remanded without vacating in such cases, *id.*; *Apache Corp. v. FERC*, 627 F.3d 1220,

1223 (D.C. Cir. 2010) (declining to vacate pipeline lease because it would cause "substantial" disruption).  Indeed, vacatur in this context is literally unprecedented: Plaintiffs have not identified *a single case* of vacatur after a pipeline has begun operations.  *See* D.E. 538-1, at 3-4.

As detailed in extensive briefing before the district court and this Court, including by multiple states and other amici, vacatur would cause widespread and immense economic harm if it shuts DAPL down.  *See*, *e.g.*, D.E. 509-1, at 31-40; A676-92, 741-68.  North Dakota producers lacking alternative transport for their oil would need to "shut in" thousands of wells, costing them around $5 to $7.5 *billion* through 2021.  A670-74, 701, 793-97, 1505-11, 1540, 1546-53, 1750-59, 1765-70.  Losses could surpass $2 billion per year even if more costly rail transport could pick up the slack.  A1519, 1547-48, 1752-53, 1800-03.  Production cuts would cost between 4,500 and 7,200 oil industry workers their jobs, A702, 1542, 1550-51, 1794-96, and North Dakota *alone* at least "hundreds of millions" in DAPL-generated tax revenues, A801 (emphasis omitted); A694-97, 1797.  Dakota Access also would suffer $2.8 to $3.5 million in revenue losses *every day* DAPL is idle in 2020, and $1 to $1.4 billion for 2021.  A1182-83, 1503-05, 1545-46.

The district court acknowledged that shuttering DAPL would cause "serious" and "immediate harm[s]," "particularly in a highly uncertain economic environment."  A156.  But it never examined the full extent of these devastating

36

harms because it thought it could discount them in gross based on general programmatic objectives. Instead, it dismissed economic considerations as "'economic myopia,'" reasoning that "accepting [these] arguments" would "subvert the structure of NEPA" by creating "'undesirable incentives'" for agencies to "build first and consider environmental consequences later." A157-58.

That categorical discounting of economic harms is contrary to this Court's repeated recognition that "social and economic" harms carry significant— sometimes dispositive—weight in NEPA cases. *NRDC v. NRC*, 606 F.2d 1261, 1272 (D.C. Cir. 1979); *Oglala*, 896 F.3d at 538; *PEER v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016); *see also Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290-91 (11th Cir. 2015) ("potential disruption to the mining industry" is an "essential fac[t]" in vacatur analysis). And a presumption that agencies *cannot* be trusted to follow the law in the face of "'undesirable incentives,'" A158, flips on its head the presumption of regularity that this Court owes official government conduct, *Favish*, 541 U.S. at 174.

The court's reasoning is also untethered to the facts. Far from "build[ing] first and consider[ing] environmental consequences later," A157-58, the Corps and Dakota Access carefully followed the law. The Corps conducted multiple rounds of extensive environmental analysis, soliciting and responding to comments from Plaintiffs and others, before issuing the easement. Dakota Access likewise did not

37

proceed with construction at Lake Oahe or pipeline operations until *after* receiving permission from the Corps, the district court, and this Court. *Supra*, at 9-10.

The district court also erred in discounting economic harms on the ground that Dakota Access "assumed" the risk of such disruption by "rel[ying] on the continued operation of the pipeline in the face of ongoing litigation." A160; *see also* A433. That ignores harms to numerous innocent third parties, including thousands of oil workers. More fundamentally, the law *allows* regulated parties to "reasonably rel[y]" on duly issued agency licenses and permits—even in the face of ongoing legal challenges—holding that disruptive consequences from such reliance counsel *against* vacatur. *Oglala*, 896 F.3d at 538 (finding disruption in part because company "reasonably relied on the NRC's ruling and settled practice that permitted the continued effectiveness of the license the Staff issued"). If project opponents can vitiate reasonable reliance on agency approvals through their opposition alone, large infrastructure projects would be repeatedly delayed or never started at all.

Dakota Access's reliance here was more than reasonable. Not only did it receive final Corps approval in early 2017, the district court determined later in 2017 that the pipeline could operate because the Corps "substantially complied" with NEPA, A4, and this Court's orders likewise allowed the project to go forward, A221, 316. That reasonable reliance cuts decisively against vacatur. *See Oglala*, 896 F.3d at 538.

38

**b.    The Court Ignored The Environmental Harms Of A Shutdown**

Although the extraordinary economic consequences of shuttering DAPL are reason enough to remand without vacatur, courts also will "not vacate" agency actions "when doing so would risk significant harm to the public health or the environment." *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019).

The district court failed to account for environmental harms. The Corps, Dakota Access, and numerous states offered extensive evidence that increased rail transport from a shutdown—which Plaintiffs' own expert conceded would occur, A1693-94—would cause significant environmental and public safety harms, including more spills and accident fatalities, D.E. 507, at 19-22; D.E. 538-1, at 22-23; A760-66, 887-92. Plaintiffs did not dispute the vast majority of this evidence. A1590-93. Yet the court dismissed these risks because it found one source of information "inconclusive." A162.

That conclusion contradicts the manifest weight of the evidence. Undisputed government and industry studies consistently show that every barrel of oil that shifts to rail transport yields a net increase in the likelihood of spills, more fatalities and injuries, and more air pollution. A887-90; D.E. 538-1, at 22-23. One recent undisputed study, for example, concludes that rail transport is *six times* more costly to the environment and human health than pipeline transport. Karen Clay et al.,

39

Material Under Seal Deleted

*External Costs of Transporting Petroleum Products: Evidence from Shipments of Crude Oil from North Dakota by Pipelines and Rail*, 40 Energy J. 55, 68 (2019).

Rail transport also increases the risk of spilled oil reaching a new tribal drinking water intake just downstream of a railroad crossing. A890. The spill volume into Lake Oahe from a worst-case train wreck exceeds the pipeline's worst case by ███, *id.*, and the water intake is much closer to the rail crossing (1.6 miles) than it is to the pipeline crossing (75 miles), *compare id.*, A1419-20, 1592, 1726-27 & n.56, *with* A878-79, 1579-80. No agency would need to approve or even review increased rail traffic; no regulation would require response plan updates; and existing rail response plans are not tailored to a wreck into Lake Oahe. A1593-95, 1727-30. Shutting down the pipelines thus "would be the equivalent to a major federal action with no regulatory oversight or environmental agency review and approval." A872-73.

Even the one study that the court addressed, A162 (calling a PHMSA study "inconclusive"), found that pipelines "have lower spill occurrences and amounts than rail transport." *Id.* Indeed, PHMSA found pipelines safer than rail on *every metric but one*. A725. And that one metric (slightly more annual injuries from one cause) is more than offset by the other metrics, including more rail injuries and fatalities *overall* when derailments and traffic accidents are counted. A1591-92.

The court did not mention at all other undisputed environmental harms:

Closing DAPL would cause methane emissions from closed wells, A891-92 & n.13; the need to fill DAPL with an inert gas to avoid corrosion while out of service would risk injury to workers, A1182-83; and huge quantities of nitrogen would be released into the atmosphere when DAPL comes back online, A1599.

The district court's disregard for these serious and largely undisputed environmental and public health consequences—which more than offset the speculative risks of a DAPL spill—independently warrants reversal of vacatur. *Wisconsin*, 938 F.3d at 336.

### c.    The Court Erred In Crediting Plaintiffs' Speculative Spill Concerns

The district court compounded its error by concluding that highly speculative risks from DAPL's continued operation outweighed acknowledged economic harms and undisputed environmental harms.

The risk of a large spill into Lake Oahe is not merely low—it is almost nonexistent.  No one disputes that (1) a spill materially exceeding ████ barrels at Lake Oahe is a once-in-human-existence event; (2) DAPL has had *no spills* on its nearly 1,200-mile mainline in more than three years of operation; and (3) Dakota Access has response plans in place to swiftly and effectively remediate a spill many times larger than the worst-case discharge the Corps modeled.  *See supra*, at 23-24, 31.

The court's merits determination that the Corps should conduct further

analysis of spill consequences does not establish that Plaintiffs "will … suffer harm" if DAPL continues operating during the remand.  *Oglala*, 896 F.3d at 538.  Further, the court ignored Dakota Access's additional evidence that the pipeline is safe, *see supra*, at 31, violating the rule that when "relief is at issue," courts are not limited to the administrative record, *Esch v. Yeutter,* 876 F.2d 976 (D.C. Cir. 1989).  Under any record, the chance of a large spill is far too remote to warrant any weight.

### C.    The District Court's Injunction Is Ultra Vires

The district court also overstepped its authority in requiring Dakota Access to "shut down the pipeline and empty it of oil."  A139.  Apart from premising the injunction on a flawed decision to vacate the easement, *see* A162, the court articulated no legal basis for injunctive relief, *see* Doc. 1855206, at 1 (granting stay).

Vacating the easement triggered the Corps' process for addressing an "'encroachment'" on Corps property, a process that the district court recognized is entirely within "the Corps' discretion."  A161.  Private parties have no cause of action to enforce federal property rights.  NEPA creates "no private right of action," and "nothing in the APA authorizes claims against nonfederal entities." *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295, 1298 (D.C. Cir. 2007).  It is not for the courts to "dictate to the agency what course it must ultimately take."  *Nat'l Tank Truck Carriers, Inc. v. EPA*, 907 F.2d 177, 185 (D.C. Cir. 1990).  Indeed, the Corps' decision whether to enforce its rights at all—like any other "agency

42

decisio[n] not to institute proceedings"—is entirely "unreviewable" under 5 U.S.C. § 701(a)(2). *Heckler v. Chaney*, 470 U.S. 821, 837 (1985).

Further, the "district court did not make the findings necessary for injunctive relief" under "'the traditional four-factor test.'"  Doc. 1855206, at 1 (stay order, quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010)). Plaintiffs have never attempted to clear the insurmountable hurdle of proving—in the face of an infinitesimally low likelihood of a large spill—"that irreparable injury is *likely* in the absence of an injunction." *Winter v. NRDC*, 555 U.S. 7, 22 (2008); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (party seeking injunctive relief must "'carr[y] the burden of persuasion'" "'by a clear showing'").  The injunction cannot stand.

**CONCLUSION**

This Court should reverse the district court's summary judgment and remedy rulings.

August 26, 2020                                    Respectfully submitted,

                                                   /s/ Miguel A. Estrada
                                                  Miguel A. Estrada
                                                    *Counsel of Record*
                                                  William S. Scherman
                                                  David Debold
                                                  GIBSON, DUNN & CRUTCHER LLP
                                                  1050 Connecticut Avenue, N.W.
                                                  Washington, D.C. 20036
                                                  (202) 955-8500
                                                  mestrada@gibsondunn.com

                                                  *Counsel for Dakota Access, LLC*

44

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type style, and type-volume limitations. This brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this brief contains 9,747 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

August 26, 2020                                     Respectfully submitted,

   /s/ Miguel A. Estrada
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mestrada@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that, on August 26, 2020, I electronically filed the Opening Brief for Intervenor-Defendant-Appellant Dakota Access, LLC with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

August 26, 2020                                    Respectfully submitted,

                                                     /s/ Miguel A. Estrada
                                                    Miguel A. Estrada
                                                    GIBSON, DUNN & CRUTCHER LLP
                                                    1050 Connecticut Avenue, N.W.
                                                    Washington, D.C. 20036
                                                    (202) 955-8500
                                                    mestrada@gibsondunn.com